# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

### COLUMBIA DIVISION

CHARLOTTE R. THOMPSON, )
M.D., and SCOTT W. THOMPSON,)
M.D., )
          )
      Plaintiff,    )    Civil Action No. 3:04-219-CMC-BM
          )
v.           )
          )    **REPORT AND RECOMMENDATION**
THE UNIVERSITY OF SOUTH   )
CAROLINA; and RICHARD M.   )
DAVIS, M.D., individually and in )
his official capacity,     )
          )
      Defendants .   )
_____)

    This action was filed by the Plaintiffs alleging claims for gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq. (first cause of action-against the Defendant USC only), retaliation/constructive discharge in violation of Title VII (second cause of action-against the Defendant USC only), violation of the Equal Pay Act (third cause of action-against the Defendant USC only), violation of the South Carolina Payment of Wages Act (fourth cause of action-against the Defendants USC and Richard Davis, individually), breach of contract (fifth cause of action-against the Defendants USC and Davis, individually), breach of contract accompanied by a fraudulent act (sixth cause of action-against the Defendant Davis only), breach of the implied covenant of good faith and fair dealing (seventh cause of action-against the Defendant Davis only), interference with prospective contractual or economic relationships (eighth cause of action-against the Defendant Davis only), defamation (ninth cause of action-against the

1



Defendant Davis only), and loss of consortium (tenth cause of action-against the Defendant Davis only). Plaintiff Charlotte Thompson (hereinafter "Plaintiff") is a former employee of the Defendant USC. Scott Thompson (hereinafter "Thompson") is her husband.

On September 27, 2005, the parties filed a joint stipulation of partial dismissal with prejudice with respect to Plaintiff's first, third and eighth causes of action. The Defendants thereafter filed a motion for partial summary judgment on September 30, 2005, seeking dismissal of all of the remaining causes of action in the Complaint except for Plaintiff's second cause of action. Plaintiffs filed a memorandum in opposition to the Defendants' motion on November 2, 2005, in which Plaintiffs consent to the dismissal of their seventh cause of action for breach of the implied covenant of good faith and fair dealing. Plaintiffs oppose dismissal of the remaining claims. Defendants filed a reply memorandum on November 15, 2005. Defendants' motion is now before the Court for disposition.[1]

### Background and Evidence[2]

Plaintiff is an Ophthalmologist who was hired by the University of South Carolina School of Medicine in 2000. Plaintiff's supervisor was the Defendant Davis, Chair of the Department of Ophthalmology. At the time of her hiring, Plaintiff was in private practice in Pittsburgh, where her husband, Scott Thompson, was an Assistant Professor at the University of

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. The Defendants have filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

[2]The facts and evidence are considered and discussed in this Report and Recommendation in the light most favorable to the Plaintiff, the party opposing summary judgment. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).

2



Pittsburgh.  See Plaintiff's Deposition, p. 27; Thompson Deposition, pp. 7-8.

Plaintiff applied for the faculty position in response to an advertisement. Plaintiff's Deposition, p. 51; Defendants' Exhibit 4.  The position was advertised as having a salary range of between $126,000 and $150,000, but following an interview, Davis extended Plaintiff a job offer as an Assistant Professor with a salary of $175,000, plus benefits. Plaintiff's Deposition, p. 53; Defendants' Exhibit 8.  This job was to begin in July or August 2000. Id.  On April 21, 2000, Davis wrote to the Plaintiff stating that her salary would be $180,000 for three years "since this was your understanding".  Plaintiff's Deposition, Defendants' Exhibit 9.  Plaintiff accepted Davis' offer by letter dated April 29, 2000, saying that she would begin work on November 15, 2000.  Plaintiff's Deposition, Defendants' Exhibit 10.

However, in addition to her correspondence with Davis, Plaintiff had also separately received a letter from both Davis and Dr. Larry Faulkner, Vice President for Medical Affairs and Dean of the School of Medicine, dated April 5, 2000.  This letter stated that Plaintiff was being offered a position "at a twelve month salary of $60,000," and further provided that Plaintiff would be expected to participate in the U.S.C. School of Medicine Clinical Family Practice Plan. Plaintiff's Deposition, Defendants' Exhibit 12.  This letter had, as an attachment, a Member Compensation Agreement that Plaintiff was supposed to sign and return.  Plaintiff's Deposition, Defendants' Exhibit 12, p. 3.  On April 21, 2000, Department Administrator John Hubbard sent Plaintiff a copy of the University's Clinical Faculty Practice Plan.  Plaintiff's Deposition, Defendants' Exhibit 11. The Practice Plan provided, inter alia, that compensation of clinical faculty members was divided into two parts, base salary and Practice Plan income, with the Practice Plan income to be paid out of gross collections of the Department.  Id, at pp. 8-9.  This compensation arrangement was set forth

3



in the Member Compensation Agreement, which was attached to the Practice Plan as Exhibit A. <u>Id</u>., pp. 9-10.

Plaintiff testified that she questioned why she had to sign these separate documents, since she had already sent in a written acceptance letter on April 29, 2000, but that Davis told her she had to sign and return the material from Dean Faulkner or she "[couldn't] start working here." <u>Plaintiff's Deposition</u>, p. 59. Plaintiff testified that she then signed that letter, attached a copy of her letter of April 29, 2000 to Davis referencing the salary of $180,000.00, and sent it back to Dean Faulkner. <u>Id</u>.; <u>see also</u> <u>Defendants' Exhibit 12</u>. That was on June 15, 2000. <u>Id</u>. Plaintiff still had not signed the Member Compensation Agreement that had been forwarded to her, but after being advised by Hubbard that she had to sign that Agreement to begin work, she did sign the Agreement and returned it to the University. <u>Plaintiff's Deposition</u>, pp. 64-66, <u>Defendants' Exhibit 19</u>, p. P-1877; <u>Hubbard Deposition</u>, pp. 11-12, 15-16, 34. The Member Compensation Agreement reflected a base salary of $60,000.00, with a maximum practice plan income of $120,000.00. <u>Plaintiff's Deposition, Defendants' Exhibit 19</u>, p. P-1877. Plaintiff thereafter began her employment with the University on November 16, 2000. <u>Plaintiff's Deposition</u>, p. 73.

Upon beginning her employment with the University, Plaintiff received pay at a rate of $180,000.00 per annum through the rest of 2000. <u>Plaintiff's Deposition</u>, pp. 131-132; <u>Defendants' Exhibit 44</u>, p. SUPP-D-0299. Plaintiff was asked to sign a second Member Compensation Agreement on December 6, 2000, to become effective January 1, 2001. <u>Plaintiff's Deposition, Defendants' Exhibit 19</u>, p. P-0117. This Agreement was identical to the July 2000 Agreement except for the date, and Plaintiff continued to receive pay at the rate of $180,000.00 per annum for 2001. <u>Plaintiff's Deposition</u>, pp. 131-132; <u>Defendants' Exhibit 44</u>, p. SUPP-D-00304.



On October 3, 2001, Plaintiff received a letter from Davis and Faulkner offering her reappointment as Assistant Professor of Clinical Ophthalmology in the School of Medicine at a twelve month salary of $61,200.00, effective November 16, 2001 and ending November 15, 2002. <u>Plaintiff's Deposition, Defendants' Exhibit 19</u>, p. P-1878.  Plaintiff executed this letter and returned it to the University. <u>Id</u>.  However, on December 8, 2001, Plaintiff also received and executed a third Member Compensation Agreement for the year beginning January 1, 2002, the terms of which were identical to the first two Member Compensation Agreements except for the date.  <u>Plaintiff's Deposition, Defendants' Exhibit 19</u>, p. P-1879.[3]

Plaintiff did not receive pay at a $180,000.00 annual rate in 2002. <u>Plaintiff's Deposition</u>, pp. 132-133; <u>Defendants' Exhibit 44</u>, p. SUPP-D-0309.  Hubbard testified that when Plaintiff came to him and asked about her decreased compensation, he told her that she was not covering her expenses and overhead, and that a physician has to earn his or her salary plus a share of the overhead in order to be paid.  Hubbard also testified that the amount of any supplemental pay to be received by a physician was within Davis' discretion. <u>Hubbard Deposition</u>, pp. 95-97.  It is undisputed that by that time, Davis had become critical of Plaintiff's billings, collections and general productivity. See <u>Plaintiff's Deposition, Defendants' Exhibit 17-18</u>.

The working relationship between Davis and Plaintiff continued to deteriorate throughout 2002, and on August 20, 2002, Plaintiff submitted her resignation effective September

---

[3]Although the letter from Davis and Faulkner of October 3, 2001 referenced a twelve month salary of $61,200.00, effective November 16, 2001 and ending November 15, 2002, while also noting that Plaintiff would be expected to continue to participate in the Clinical Family Practice Plan (no compensation figure provided), the December 28, 2001 Member Compensation Agreement continued to reference a base salary of $60,000.00, with a maximum allowed income through the Clinical Family Practice Plan of $120,000.00.



17, 2002.  <u>Plaintiff's Deposition, Defendants' Exhibit 36</u>.  In her resignation letter, Plaintiff stated,

in part: "I am not resigning from my position, but I am leaving due to constructive discharge.  I'm

not able to continue to work under these conditions."  <u>Id</u>.  Following her resignation, Plaintiff set

up her own practice.  Plaintiff testified that at a meeting at Palmetto Health Richland on March 5,

2003, Davis commented that he wanted to report a problem to the group concerning the

"oculoplastic person at the hospital," stating that this physician refused to come and evaluate

patients when she was called by other physicians. <u>See</u>  <u>Whiteside Declaration</u>; <u>see</u> <u>also</u> <u>Plaintiff's</u>

<u>Deposition</u>, pp. 207, 212-215;.  Plaintiff was the only physician who practiced in the sub-specialty

of oculoplastics  who was on active staff at the hospital. <u>Id</u>.

### Discussion

Summary judgment "shall be rendered forthwith if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as

a matter of law."  Rule 56(c), Fed.R.Civ.P.  The moving party has the burden of proving that

judgment on the pleadings is appropriate.  Once the moving party makes this showing, however, the

opposing party must respond to the motion with "specific facts showing there is a genuine issue for

trial." Rule 56(e), Fed.R.Civ.P.

### I.

### (Claim Under the South Carolina Payment of Wages Act)

Plaintiff has asserted her claim under the South Carolina Payment of Wages Act

against both the Defendant University of South Carolina and Dr. Davis, individually. <u>See</u> S.C.Code

Ann. § 41-10-10, <u>et.</u> <u>seq.</u>.  This Act creates a cause of action against an employer by an employee

6



for failure of the employer to pay wages as required under that Act.  S.C. Code Ann. § 41-10-80(C).

Defendants argue that they are entitled to summary judgment on Plaintiff's Payment of Wages Act claim because it is barred by the Eleventh Amendment to the United States Constitution, and in any event fails on the merits.  Plaintiff does not dispute that, as an arm of the State of South Carolina, the University of South Carolina is entitled to immunity from suit afforded by the Eleventh Amendment.  See Maryland Stadium Authority v. Ellerbe Becket, Inc., 407 F.3d 255, 262 (4th Cir. 2005); Schley v. College of Charleston, No. 95-1932, 1996 WL 193867, at *3 (4th Cir. 1996); Clemson University v. W.R. Grace & Co., No. 86-2055, 1991 WL 112319 (D.S.C. 1991).  Plaintiff argues, however, that the University has waived its Eleventh Amendment immunity by failing to raise it as an affirmative defense in its answer and by actively litigating this case for two (2) years without providing Plaintiffs fair warning of their objection.  Plaintiff also argues that the Defendant Davis, in his individual capacity, is not protected by the Eleventh Amendment in any event.

Both sides make cogent and well reasoned arguments on behalf of their respective positions, and both sides also cite caselaw which supports their positions.  To say that this area of the law is "muddled" is to be generous.  Longstanding precedent has consistently held that assertion of Eleventh Amendment immunity as a defense may be raised at any time in the course of legal proceedings, even for the first time on appeal.  See generally, Edelman v. Jordan, 415 U.S. 651, 678 (1974); Alabama v. Pugh, 438 U.S. 781, 782, n. 1 (1978); Patsy v. Board of Regents of the State of Florida, 457 U.S. 496, 515, n. 19 (1982); Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 99, n. 8 (1984); Constantine v. Rectors & Visitors of George Mason University, 411 F.3d 474 (4th Cir. 2005); Kitchen v. Upshaw, 286 F.3d 179, 183 (4th Cir. 2002).  The State may, however,



through its actions, waive its immunity; see Atascadero State Hospital v. Scanlon, 473 U.S. 234, 238 (1985); and the question presented here is whether the Defendants, by filing a responsive pleading which failed to cite the Eleventh Amendment as a defense and thereafter litigating this case for almost two years before first raising this defense in its motion for summary judgment, have waived the State's immunity.

The Supreme Court addressed the issue of waiver in Lapides v. Board of Regents of the University System of Georgia, 535 U.S. 613 (2002), discussing in some detail the difference between waiver due to a state's voluntary appearance in federal court versus non-waiver due to an involuntary appearance.  In Lapides, the Supreme Court held that whether a state's actions amount to a waiver of the State's Eleventh Amendment immunity is a question of federal law, and that (in that case) the State of Georgia, by agreeing to remove a case to federal court which had originally been brought in state court,  voluntarily invoked the federal court's jurisdiction and thereby waived its Eleventh Amendment immunity.  Id.; see also CSX Transportation, Inc. v. Transportation-Communications Inter. Union, 413 F.Supp.2d 553, 563-564 (D.Md. Feb. 6, 2006). The Court distinguished this circumstance from the situation where a state's federal court participation is involuntary, such as when the State has been involuntarily made a defendant in federal court through a suit brought by a plaintiff. Lapides, 535 U.S. at 621-622.

Defendants correctly point out that the situation faced by the court in Lapides is not the situation before the Court in the case at bar, since this is not a case that was removed to federal court by the Defendants.  However, Defendants' argument (which is correct) does not mean that the Supreme Court in Lapides held that there can be a waiver *only when* a state voluntarily removes a case filed in state court to federal court.  Rather, the Court held generally that attorneys authorized

8



by the State can voluntarily invoke the federal court's jurisdiction through their actions and conduct; <u>Lapides</u>, 535 U.S. at 622-623; and in so holding expressly overruled <u>Ford Motor Co. v. Department of Treasury of Indiana</u>, 323 U.S. 459 (1945), a case in which the Court had earlier sustained an Eleventh Amendment defense raised by a state for the first time on appeal after the State had already litigated (and lost) a claim brought against it in federal court. <u>Lapides</u>, 535 U.S. at 622-623.

        Plaintiff argues that the Defendants' actions in the case at bar are exactly the type of conduct which should be deemed to be a voluntary waiver of the State's immunity by this Court. In addition to pointing out that the Defendants did not assert immunity as a defense in their answer and have litigated this case for almost two years prior to raising this defense in the first instance in their motion for summary judgment, Plaintiff further points out that the Defendants' strategy in doing so was apparently to prevent Plaintiffs from being able to re-file their state law claims in state court, as the statute of limitations has now expired on Plaintiffs' state law claims, and the federal supplemental jurisdiction statute does not toll statutes of limitations for claims against non-consenting states filed in federal court when those claims are dismissed on Eleventh Amendment grounds.  See <u>Raygor v. Regents of the University of Minnesota</u>, 534 U.S. 533, 546 (2002). Plaintiffs note that this is precisely the type of conduct that some courts have found to constitute a waiver by a state of its Eleventh Amendment immunity. See <u>Ku v. State of Tennessee</u>, 322 F.3d 431, 435 (6th Cir. 2003) ["appearing without objection and defending on the merits in a case over which the district court otherwise has original jurisdiction is a form of voluntary invocation of the federal court's jurisdiction that is sufficient to waive a State's defense of Eleventh Amendment immunity"]; <u>Hill v. Blind Industries & Services M.D.</u>, 179 F.3d 754, 757-758 (9th Cir. 1999) ["we see no valid reason why a party should belatedly be permitted to assert Eleventh Amendment immunity...."];



<u>Christy v. Pennsylvania Turnpike Commission</u>, 54 F.3d 1140, 1144 (3d Cir. 1995).[4]

However, Defendants offer their own caselaw in support of their contention that they are fully entitled to raise Eleventh Amendment immunity in their motion for summary judgment, even at this stage of the proceedings, taking particular note of what appears to be the prevailing doctrine in the Fourth Circuit to allow this litigation strategy. <u>Suarez Corp. Industries v. McGraw</u>, 202 F.3d 676, 683, n. 12 (4th Cir. 2000); <u>Constantine</u>, 411 F.3d at 480-481 ["Eleventh Amendment immunity may be asserted at any time in the litigation"]; <u>Kitchen</u>, 286 F.3d at 183 [same]; <u>Booth v. State of Maryland</u>, 112 F.3d 139, 145, n. 2 (4th Cir. 1997); <u>Maryland v. Antonelli Creditors' Liquidating Trust</u>, 123 F.3d 777, 786 (4th Cir. 1997). To be sure, every case has its own factual twist. For example, in <u>Herron v. Virginia Commonwealth University</u>, 366 F.Supp.2d 355 (E.D.Va. 2004), the Court held that the State had not waived its Eleventh Amendment immunity, even though it had engaged in extensive discovery, finding that "[e]ven though it would have been more expeditious to raise the defense earlier in the litigation, the defense of sovereign immunity can be raised at any time, even on appeal, at least where there is no basis to conclude that the state took any affirmative action other than pre-trial preparation so as to constitute a binding waiver of the defense." <u>Id</u>, at pp. 362-363. In that case, however, unlike in the case at bar, the Defendant did raise the doctrine of sovereign immunity as a potential defense in its answer, whereas in the case at bar the Defendants did not. However, factual deviations can be found in the cases cited by the Plaintiff as well. For example, in <u>Ku</u> the defense was first raised by the State in a motion to stay pending appeal of an adverse ruling on summary judgment. That obviously is not the case here, where the

---

[4]But <u>see</u>, <u>United States v. Government of the Virgin Islands</u>, 363 F.3d 276, 284 (3d Cir. 2004).



defense has been presented as part of Defendants' dispositive motion.

In sum, while attorneys for the State can waive their client's Eleventh Amendment immunity through their actions; <u>Lapides</u>, <u>supra</u>; it is far from clearly established law that litigating a claim through the discovery process before asserting the defense in a motion for summary judgment constitutes waiver. While the Ninth and Sixth Circuits would apparently so hold, and while the undersigned is certainly sympathetic to Plaintiffs' position, none of the Fourth Circuit precedents cited by the Defendants have been overruled, and it is those precedents which are binding on this Court. The undersigned is not in a position to make new law in this Circuit. <u>Constantine</u>, 411 F.3d at 480-481 ["Eleventh Amendment immunity may be asserted at any time in the litigation"]. <u>See also</u> <u>Raygor</u>, 534 U.S. at 547 [A case decided contemporaneously with <u>Lapides</u>, in which the Supreme Court noted that a standard of inferring consent from the failure of a state to raise the immunity defense at the outset of the proceedings was "a standard this court has not adopted"]; <i>cf.</i> <u>Bravo Perazza v. Puerto Rico</u>, 218 F.Supp.2d 176, 179 (D. Puerto Rico 2002) [distinguishing <u>Lapides</u>, and holding that the plaintiff "has not cited one case, and the Court has found none, where a State has been found to waive its Eleventh Amendment immunity because it failed to raise the immunity defense prior to filing its summary judgment motion"]; <u>Union Electric Company v. Missouri Dept. of Conservation</u>, 366 F.3d 655, 659-660 (8th Cir. 2004); <u>Fromm v. Comm'n of Veterans Affairs</u>, 220 F.3d 887, 888-890 (8th Cir. 2000) (en banc).

Even with respect to Plaintiffs' argument that they may be barred from re-filing their claims in state court if Defendants' motion is granted on Eleventh Amendment grounds, precedent in this District is adverse to their position. <u>See</u> <u>Bellamy v. Borders</u>, 727 F.Supp. 247, 250, n. 2 (D.S.C. 1989) [noting that it is "a recognized practice within the District of South Carolina to file



simultaneous actions in federal and state court where the availability of a federal forum is questionable"].  Therefore, in light of the applicable caselaw from this Circuit and District, the undersigned finds that the University of South Carolina is entitled to assert its Eleventh Amendment immunity at this time, and is entitled to summary judgment on Plaintiff's State Wage Act claim on that ground.

Finally, Plaintiff's alternative argument that she can still maintain this cause of action against the Defendant Davis in his individual capacity, even if the University is entitled to dismissal under the Eleventh Amendment, is without merit.  Plaintiff argues that the Eleventh Amendment does not bar suits against individual defendants in their individual capacities, and that she has sued Davis in his individual capacity on this state law claim, for which this Court can exercise its supplemental jurisdiction.  Plaintiff further argues that Davis is subject to suit under the South Carolina Payment of Wages Act because he had complete authority to determine what employees of the Ophthalmology Department were paid during the relevant time period, and that individual agents or officers of an employer may be personally liable to an employee for unpaid wages if such agents or officers knowingly permit the employer to violate the statutory duty to pay wages to employees when due, citing to Dumas v. InfoSafe Corp., 463 S.E.2d 641 (S.C.Ct.App. 1995).  Dumas held that agents or officers of employers are subject to individual liability under the South Carolina Payment of Wages Act if they knowingly permit the employer to violate that Act.  Dumas, 463 S.E.2d at 645.

Defendants argue that Dumas is not controlling in the case at bar because the individual in Dumas was the President and sole shareholder of the defendant company, which under the facts of that case allowed the Court to pierce the corporate veil to impose liability on that



individual.  However, that was not the Court's holding in <u>Dumas</u> with regard to liability under the Payment of Wages Act.  Rather, the Court held that the individual was liable under that Act pursuant to an agency theory, not by virtue of a piercing of the corporate veil.  <u>Id</u>.  Therefore, the question before the Court is not whether Davis can be sued individually under the South Carolina Payment of Wages Act, as that Act specifically includes the State under the definition of "employer", and a genuine issue of fact may exist as to whether Davis could be considered an "agent" of Plaintiff's employer.  <u>See</u>  S.C.Code Ann. § 41-10-10(1).  Rather, the question that must be addressed by this Court is whether Davis can be sued individually under that Act in Federal Court, or whether, as is the case  with the University, Plaintiff must pursue her claim against Davis in state court.

In deciding this question, the undersigned finds the case of <u>Lizzi v. Alexander</u>, 255 F.3d 128 (4th Cir. 2001), <u>overruled in part on other grounds by</u>, <u>Nevada Dep't of Human Resources v. Hibbs</u>, 538 U.S. 721 (2003). to be instructive.  In <u>Lizzi</u>, the Fourth Circuit upheld the dismissal of a claim against the Washington Metropolitan Area Transit Authority (WMATA) on Eleventh Amendment grounds, but also reversed the lower court to find that the individually named defendants were also entitled to dismissal under the Eleventh Amendment.[5]  After discussing the difference between a suit for damages against individual officers in their official capacities as opposed to their individual capacities, the Court noted that "the mere incantation of the term 'individual capacity' is not enough to transform an official capacity action into an individual capacity action."  <u>Lizzi</u>, 255 F.3d at 137, citing <u>Bender v. Williamsport Area Sch.Dist.</u>, 475 U.S. 534, 543 (1986). Rather, claims purporting to be brought against individuals must be examined to

_____

[5]The individual defendants in <u>Lizzi</u> held supervisory positions, although the exact positions held by some of the individually named defendants was not clear. <u>Lizzi</u>, 255 F.3d at 131.



determine whether the State is the real, substantial party in interest. That is clearly the situation in the case at bar.

Davis is the Chair of the Department of Ophthalmology, and is therefore himself an employee of the Defendant University. Davis' negotiations and dealings with the Plaintiff were clearly in his capacity as Dean, were conducted using the Defendant University's stationary and forms, and were performed, not alone, but in conjunction with the Defendant University's Vice President for Medical Affairs and Dean of the School of Medicine as well as with the Department Administrator. Plaintiff's Deposition, pp. 53, 59, 64-66; Plaintiff's Deposition, Exhibits 8-12, 19, 44. Hence, Davis' actions were "tied inextricably to [his] official duties...," and Plaintiffs' Complaint makes "no showing of any ultra vires action" taken by Davis which would subject him to individual liability on this claim. Lizzi, 255 F.3d at 136.

The Lizzi court also distinguished individual capacity suits under statutes such as 42 U.S.C. § 1983, a statute "intended as a broad enforcement vehicle to bring suit against state officials for violations of...federal statutory and constitutional rights," from statutes such as the Act at issue here, which is "focused on creating a set of statutory entitlements in its own right." Id., at p. 137. Finally, the Lizzi court noted that to hold that individual supervisors may be sued under this type of statute, while also holding that the Constitution prohibits the State itself from being sued, would undermine Supreme Court decisions and allow Plaintiffs to "easily be able to evade the Eleventh Amendment prohibition against suing a state merely by naming the individual supervisor as the employer." Lizzi, 255 F.3d at 137 ["We refuse to create such an anomaly. The state would still suffer the indignity of having each discrete decision regarding personnel or organizational matters subject to second guessing by a federal court. 'The real interests served by the Eleventh Amendment



are not to be sacrificed to elementary mechanics of captions and pleadings'"], (quoting <u>Idaho v. Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261, 270 (1997)).

Therefore, regardless of whether Davis may be sued individually as an agent of the Defendant University in state court under the South Carolina Payment of Wages Act, because the University enjoys Eleventh Amendment immunity for claims brought under that Act, Davis individually is also protected by that same immunity, and is entitled to dismissal as a Defendant under this claim. <u>Lizzi</u>, 255 F.3d at 138.

## II.

### (Breach of Contract Claim)

For the same reasons as are set forth in Section I of this Report and Recommendation, <u>supra</u>, the Defendant University of South Carolina is entitled to summary judgment on Plaintiff's breach of contract claim because it has immunity from suit in this forum pursuant to the Eleventh Amendment to the United States Constitution. <u>Edelman</u>, 415 U.S. at 678; <u>Pennhurst</u>, 465 U.S. at 99; <u>Constantine</u>, 411 F.3d at 480-481; <u>Herron</u>, 366 F.Supp.2d at 362-363.

As for Plaintiff's breach of contract claim against the Defendant Davis individually, there is no evidence before the Court to support such a claim in this case. Plaintiff points to the case of <u>Skinner & Ruddock, Inc. v. London Guarantee & Acc.Co.</u>, 124 S.E.2d 178 (S.C. 1962), for the proposition that "where an agent makes a contract in the name of his principal without authority and the principal is not liable, the agent may be held liable on such contract." <u>Id.</u>, at 180. However, that case also clearly held that "where an agent enters into a contract for a known principal, while acting within his authority as such agent, he is not personally liable on the resultant contract. The liability, if any, for a breach of such contract is that of the principal alone." <u>Id.</u>, (citing <u>Green v. Industrial</u>



Life & Health Ins.Co., 18 S.E.2d 873 (S.C. 1942)).

Here, the evidence before the Court clearly reflects that Davis had the authority as Chair of the Department of Ophthalmology to hire Plaintiff for the faculty position at issue and to negotiate her salary. Indeed, Plaintiff herself testified that Davis made the job offer to her in his capacity "as a University official" acting on behalf of the University. Plaintiff's Deposition, pp. 56-57; see also Davis Deposition, pp. 81, 89, 106 [testifying that he was "responsible on behalf of the Department and the University to set up compensation packages...for faculty"]. Given Davis' undisputed authority as set forth in the evidence, Plaintiff's argument that he acted beyond the scope of his authority in his letter of April 21, 2000 is without merit. See Plaintiff's Deposition, Defendants' Exhibit 9. Under the applicable caselaw, to the extent Plaintiff contends that this letter, together with her subsequent acceptance letter and other correspondence with both Davis and Faulkner, amounted to a "guaranteed" contract that she would be paid no less than $180,000.00 for three years, that contract is with the Defendant University, not with Davis personally. Skinner & Ruddock, 124 S.E.2d at 180; see also Hirsch v. Columbia University, 293 F.Supp.2d 372, 378-379 (S.D.N.Y. 2003) [rejecting plaintiff's breach of contract claim that the Dean of the Medical School intended to bind himself personally by including personal commitments in plaintiff's employment letter, where the letter was on University letterhead and signed by the Dean over his official title]; McKagen v. Windham, 38 S.E. 2, 4 (S.C. 1901) [in the public employment context, to show that a public agent intended to bind themself personally, there must be a showing of an unqualified intention by the parties to bind the public agent]; Mcgee v. F.S. Royster Guano Co., 39 F.R.D. 578, 580 (D.S.C. 1966) ["Where an agent enters into a contract for a known principal, while acting within his authority as such agent, he is not personally liable on the resultant contract. The liability, if any,

16



for a breach of such contract is that of the principal alone"].

Therefore, summary judgment is appropriate on Plaintiff's breach of contract claim.

### III.

### (Breach of Contract Accompanied by a Fraudulent Act)

This cause of action is asserted against the Defendant Davis only. To maintain this cause of action, Plaintiffs must prove 1) a breach of contract; 2) fraudulent intent relating to the breaching of the contract and not merely to its making, and 3) a fraudulent act accompanying the breach. RoTec Services, Inc. v. Encompass Services, Inc., 597 S.E.2d 881, 883 (S.C.Ct.App. 2004); Conner v. City of Forest Acres, 560 S.E.2d 606, 612 (S.C. 2002).

Here, Plaintiff's claim necessarily fails because, for the reasons set forth in Section II of this Report and Recommendation, supra, she has failed to show the existence of any contract between herself and the Defendant Davis, as opposed to the Defendant University. As any contract Plaintiff had was with the University and not with Dr. Davis individually, and as this claim has only been asserted against Dr. Davis, this Defendant is entitled to summary judgment on this claim. Dodgens v. Kent Mfg. Co., 955 F.Supp. 560, 567 (D.S.C. 1997) [breach of contract accompanied by a fraudulent act requires proof of an underlying contract]; Floyd v. Country Squire Mobile Homes, Inc., 336 S.E. 2d 502, 503 (S.C.Ct. App. 1985).

### IV.

### (Defamation Claim)

Plaintiff's claim for defamation is again brought against the Defendant Davis only. The elements of defamation include: 1) a false and defamatory statement concerning another; 2) an unprivileged publication to a third party; 3) fault on the part of the publisher; and 4) either



actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. Murray v. Holnam, Inc., 542 S.E.2d 743, 748 (S.C.Ct.App. 2001). Defamatory communications can take two forms: libel and slander. Slander is a spoken defamation, while libel is a written defamation or one accomplished by actions or conduct. Swinton Creek Nursery v. Edisto Farm Credit, 514 S.E.2d 126 (S.C. 1999).

Here, the defamation alleged in the Complaint was both in the form of libel and slander. Plaintiff argues in her brief that Davis "published statements to various third parties to the effect that Plaintiff's job performance was unsatisfactory, that she was derelict in her duties, and unfit in her profession," and that these statements injured her reputation, both in the community and in her profession. Plaintiff's Brief, at pp. 29-30. Plaintiff testified that Dr. Davis made derogatory statements about her to other physicians at the Medical School, that Dr. Davis criticized her professionalism at a hospital meeting, and that Dr. Davis through his actions made it appear to Plaintiff's patients and to referring physicians that Plaintiff had abandoned her patients. Plaintiff's Deposition, pp. 206-210, 213.

Defendants correctly point out that some of Plaintiff's testimony is based on inadmissible hearsay; however, Plaintiff has offered evidence to support her claims that Davis was critical of her performance and professionalism in a public way. Pakalnis Deposition, pp. 31-32 ; Spires Deposition, pp. 27-30; Driscoll Deposition, pp. 15, 18-20; Cannon Deposition, pp. 17-18; Whiteside Declaration. Plaintiff has also submitted evidence to substantiate her claim that Davis refused to provide information to her patients about her leaving and/or where she could be contacted. Driscoll Deposition, pp. 15-17, 37. This evidence reflects that Dr. Davis berated Plaintiff in the presence of others, both staff and patients, and in areas accessible by the public; and that he made

18



critical comments relating to Plaintiff's professionalism and job performance, such as that "she wasn't pulling her weight as far as how many patients she was seeing...". Cannon Deposition, p. 21; Driscoll Deposition, pp. 18-20. Dr. Brandon Whiteside, an Ophthalmologist, attests in his affidavit that during a staff meeting at the Palmetto Health Richland Department of Ophthalmology on March 5, 2003, Dr. Davis told those assembled at the meeting that Plaintiff was refusing to come and evaluate patients when she was called by other physicians, and that he was

> surprised to hear [Dr. Davis] make such statements regarding [the Plaintiff] to an audience that included Ophthalmologists (which were her peers and potential referring physicians), hospital administrators and hospital staff members. The statements he made were serious allegations, and clearly derogatory towards [the Plaintiff]. The statements that [Dr. Davis] made indicated that his opinion was that [Plaintiff] was inadequate or unfit as a physician since he reported that she was not performing her responsibilities expected of a physician on active staff at the hospital. When I heard the statements I recall silently questioning [Dr. Davis'] motivation for uttering such statements. I wondered whether there was any truth to his statements, or whether he was making the statements to hurt [Plaintiff's] professional reputation.

Whiteside Affidavit, ¶ 7.

This evidence is sufficient to survive Defendant's summary judgment motion. Plaintiff has submitted evidence to show that she was professionally well qualified and performed her job well, and that Dr. Davis' statements and actions about her were false and presented her in a false light. See generally, Spires Deposition, pp. 6, 24-30, 42-43, 47-48; Thivierge Deposition, pp. 20, 37-39, 42; Driscoll Deposition, pp. 8-9; Pakalnis Deposition, pp. 29-30, 37, 42; Bynoe Deposition, pp. 9-10; Cannon Deposition, pp. 7-9; Oswald Deposition, pp. 17-18, 21-23; Cochran Deposition, p. 37; Whiteside Affidavit.    The evidence is also sufficient to create an issue of fact as to whether Dr. Davis' statements and/or actions or conduct were published to third parties, and were actionable. Murray, 542 S.E.2d at 748; Holtzscheither v. Thomason Newspapers, Inc., 506 S.E.2d 497, 501 (S.C. 1998) ["[D]efamation allows a plaintiff to recover injury to her reputation as



the result of the defendant's communication to others of a false message about the plaintiff....The defamatory meaning of a message or statement may be obvious on the face of the statement, in which case the statement is defamatory per se."]; see also Swinton Creek Nursery, 514 S.E.2d at 134. Further, allegedly defamatory actions which falsely charge an individual with unfitness in one's business or profession are actionable per se. Goodwin v. Kennedy, 552 S.E.2d 319, 322-323 (S.C.Ct.App. 2001).

   Defendant argues that Plaintiff has presented no evidence to show unprivileged communications to third parties, and that in any event Dr. Davis' communications were made in good faith. See Holtzscheiter v. Thomson Newspapers, Inc., 506 S.E.2d 497, 507 (S.C. 1998) ["the publication of defamatory matter is its communication...to a third party - someone other than the person defamed"]; Bell v. Evening Post Publishing Co., 459 S.E.2d 315, 317 (S.C.Ct.App. 1995) [communications between officers or agents of the same corporation generally enjoy a qualified privilege]; Fulton v. Atlantic Coast Line R.Co., 67 S.E.2d 425, 429 (S.C. 1951) ["One publishing defamatory words under a qualified or conditional privilege is only liable upon proof of express malice"]; Murray, 542 S.E.2d at 749 ["A communication made in good faith on any subject matter in which the person communicating has an interest or duty is qualifiedly privileged if made to a person with a corresponding interest or duty even though it contains matter which, without this privilege, would be actionable"]. However, even assuming Dr. Davis only made the comments and or engaged in the conduct alleged in settings which would entitle him to a qualified privilege (which the undersigned expressly does not find), there is ample evidence in the record to give rise to at least a question of fact as to whether his comments/conduct were made in good faith or with malice. A finder of fact could also conclude from this evidence that the defamatory meaning of Davis'



statements and/or conduct was obvious on the face of the statements and actionable <u>per se</u> because it falsely charged Plaintiff with unfitness in her business or profession.

While Defendants have offered evidence to dispute Plaintiff's claims and to show that Dr. Davis' statements and/or conduct were not defamatory under the facts and the applicable caselaw, considering this evidence in the light most favorable to the Plaintiff, the undersigned cannot find as a matter of law that his actions were not defamatory. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 259 (1986) ["Credibility determinations, the weighing of evidence, and the choosing of inferences from the facts" are functions of the jury]; <u>Muhammad v. Klotz</u>, 36 F.Supp.2d 240, 243 (E.D.Pa. 1999) ["Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is a need for a trial, that is, 'whether the evidence presents a sufficient disagreement to require submission to [the jury] or whether it is so one-sided that one party must prevail as a matter of law'"], citing <u>Anderson</u>, 477 U.S. at 250-252. Therefore, Defendant's motion for summary judgment with respect to Plaintiff's defamation claim should be denied.[6]

---

[6]Defendant Davis' argument that he is entitled to summary judgment on this claim because Plaintiff has not proven any damages is without merit, as damages are presumed where you have defamation <u>per se</u>. Further, the fact that Plaintiff testified that she has a good reputation among referring physicians and that her practice has been successful does not mean that she was not harmed, if she was in fact defamed. <u>Goodwin v. Kennedy</u>, 552 S.E.2d 319, 323 (S.C.Ct.App. 2001) ["In a defamation action that is actionable <u>per se</u>, general damages are presumed and need not be proven by the Plaintiff."].

There is also sufficient evidence to create a genuine issue of fact as to whether Dr. Davis was acting with actual malice; i.e., that he had knowledge of the falsity of his statements and/or actions or acted with reckless disregard for their truth. Therefore, Plaintiff's defamation claim is not barred by the South Carolina Tort Claims Act (SCTA), S.C.Code Ann. § 15-78-10, <u>et. seq.</u>; <u>see</u> <u>Fleming v. Rhodes</u>, 567 S.E.2d 857, 861 (S.C. 2002); <u>Sanders v. Prince</u>, 403 S.E.2d 640 (1991); <u>Gause v. Doe</u>, 451 S.E.2d 408 (S.C.Ct.App. 1994).

21



# V.

## (Claim for Loss of Consortium)

Plaintiff Scott Thompson asserts a claim for loss of consortium against the Defendant Davis. A loss of consortium is a claim for loss of companionship and society of a spouse. It cannot be weighed and measured and is not bought and sold, nor is any expert competent to testify as to its value. The finders of fact are to determine the value of the loss from their own knowledge, conscientiously applied to the facts and circumstances of the case. Scott Thompson may therefore be entitled to compensation if the facts show by a preponderance of the evidence that the Defendant's conduct resulted in a loss to him. See generally, Cook v. Atlantic Coast Line Rail Co., 13 S.E.2d 1 (S.C. 1941); Sossamon v. Nationwide Mutual Ins. Co. , 135 S.E.2d 87 (S.C. 1964).

Defendant advances several arguments as to why Scott Thompson's loss of consortium claim should be dismissed. First, Defendant argues that his claim is barred under the South Carolina Tort Claims Act. However, this argument is without merit because the undersigned has already found there is sufficient evidence to create an issue of fact as to whether Davis acted with actual malice. See note 6, supra. Defendant also argues that this claim is barred by the exclusive remedy provision of the South Carolina Worker's Compensation Law. S.C.Code Ann. § 42-1-540 (1985); see Lowery v. Wade Hampton Co., 241 S.E.2d 556, 558 (S.C. 1978) [Worker's Compensation Act precluded claim for loss of consortium arising out of a result of a woman's injury in an automobile accident during the course of her employment]. However, Defendant concedes that a defamation action could provide the basis for "intentional or malicious conduct" which would not be barred by the Act, and under this theory, to the extent Scott Thompson's loss of consortium claim arises out of Plaintiff's defamation claim, it also would not be barred by that Act. Loges v. Mack



<u>Trucks, Inc.</u>, 417 S.E.2d 538, 540 (S.C. 1992) [Slander claim was not barred by exclusive remedy provision of Workers' Compensation Act].

Defendant argues, however, that Plaintiff is only pursuing a defamation claim based on conduct which allegedly occurred in March 2003, after she had left the University's employ, while her husband is basing his claim for loss of consortium on a period of time when Plaintiff was employed. The undersigned does not agree. Plaintiff's defamation claim includes conduct which occurred after Plaintiff had left the University's employ, and Plaintiff's husband specifically testified about their financial stress, which obviously continued after Plaintiff's employment ended. <u>Thompson Deposition</u>, p. 19. Plaintiff's husband also testified that the stress improved as Plaintiff started her practice and got things together, clearly indicating that Scott Thompson's loss of consortium continued after Plaintiff had left the University's employ. <u>See</u> <u>Thompson Deposition</u>, pp. 22-23. Therefore, there is at least a question of fact as to whether part of Thompson's claim for loss of consortium is not barred by the Worker's Compensation Act.

Scott Thompson has also submitted evidence to show he suffered a loss of his wife's consortium in society; <u>see</u> <u>Scott Thompson Deposition</u>, pp. 15-28; <u>Plaintiff's Response to Defendants' First Set of Interrogatories No. 6</u>; and, as previously noted, Plaintiffs have also provided evidence to create an issue of fact as to whether Davis acted with actual malice in his treatment of the Plaintiff. Therefore, Defendant's motion for summary judgment with respect to Scott Thompson's loss of consortium claim should be denied.

### <u>Conclusion</u>

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment be **granted** with respect to Plaintiffs' fourth and fifth causes of action, but that the motion



be **denied** with respect to Plaintiffs' ninth and tenth causes of action.

_____
Bristow Marchant
United States Magistrate Judge

Columbia, South Carolina

June   30,   2006

